NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE DEPENDENCY AS TO J.K.

No. 1 CA-JV 24-0070

FILED 09-20-2024

---

Appeal from the Superior Court in Mohave County
No. S8015JD202400003
The Honorable Rick A. Williams, Judge

**AFFIRMED**

---

COUNSEL

Harris & Winger, P.C., Flagstaff
By Chad Joshua Winger
*Counsel Appellant*

Arizona Attorney General's Office, Phoenix
By Ingeet Pandya
*Counsel for Appellee Arizona Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge D. Steven Williams and Judge Daniel J. Kiley joined.

---

**B R O W N**, Judge:

¶1        Justin Kidder ("Father") appeals from the juvenile court's order adjudicating his child ("J.K.") dependent.  For the following reasons, we affirm.

**BACKGROUND**

¶2        Father and Shannon Arnold ("Mother") are the parents of J.K., who was born in 2011.  On January 2, 2024, a Bullhead City S.W.A.T. team served a search warrant on Mother and Father's home (where J.K. also lived) after receiving information that forged checks and false identification cards were "at the residence."[1]  J.K. was at the home at the time of the raid.  Father told the officers there would "probably be drug paraphernalia and syringes" in the garage.  After searching the home, police found a small amount of methamphetamine and some foil with burnt residue, along with evidence related to fraud and forgery.  Following the raid, Mother was arrested, J.K. left with his grandmother, and the residence was turned over to Father.

¶3        The Department of Child Safety ("DCS") contacted Father. According to DCS, when asked to participate in a "present danger plan" and a drug test, Father refused.  DCS placed J.K. with his maternal grandparents and then petitioned for dependency as to Father, alleging he (1) neglected to provide a safe and stable home environment and proper supervision, and (2) could not provide proper parental care and control due to substance abuse.[2]  DCS also alleged that Father had "disclosed a prior dependency in California" based on "methamphetamine use" but that "he

---

[1]        At the time, Mother had a felony warrant for her arrest for forgery and fraud.

[2]        DCS also alleged J.K. was dependent as to Mother.  She later pled no contest and is not a party to this appeal.

has been clean since 2013." According to DCS, "Father denied there were any drugs in the home and claim[ed] that law enforcement is lying."

¶4 In March 2024, the juvenile court held a dependency adjudication hearing. The DCS case manager initially assigned to the case testified about Father's refusal to engage in DCS's offered services, including a present danger plan and a rule-out drug test. DCS had concerns about Father's potential use of substances given his statement to police that "there would be syringes and paraphernalia found in the garage with his belongings," and DCS was not comfortable accepting Father's claimed sobriety without evidence. The case manager explained that Father was uncooperative at a subsequent Team Decision Meeting, at which other services would be discussed, and that he left after "about five minutes," stating he had no reason to be there. She also testified about her contact with J.K., and her belief that someone had coached him on to how to answer questions.

¶5 The case specialist who took over the case in mid-January explained that part of her job duties is to assess pending dangers and safety threats to the child. She opined that "[F]ather is unable or unwilling to perform essential parental responsibilities to meet the child's immediate needs." She testified that DCS asked Father to take a drug test multiple times and by the date of the hearing, Father had not complied. Consequently, DCS had no way of knowing whether Father was using substances, which it was concerned about given what had been found in the home during the raid. She also testified that Father had not engaged in any behavioral health services and that DCS lacked information about Father's home environment.

¶6 Father testified about the S.W.A.T. encounter, asserting that the only drugs that were found were in a room which J.K. would not have had access to, and that the individual to whom the drugs belonged no longer resided at the home. Father denied being offered any other services except for drug testing.

¶7 The court found that DCS proved Father neglected to provide J.K. with a safe, stable home environment and proper supervision. The court (1) emphasized the serious criminal activity that had taken place in the home, and (2) found that Father's reluctance to participate in services or cooperate with DCS necessarily meant the court could not ascertain the home's condition or whether Father had improved his decision-making. The court's written order further concluded that Father (1) "is unwilling or unable to provide proper and effective parental care and control and

neglected to provide a safe and stable home environment and proper supervision," and (2) his "history of poor judgment and his lack of engagement provides no evidence that it has improved." Father timely appealed. We have jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

**¶8** Father challenges the sufficiency of the evidence supporting the juvenile court's dependency finding. We accept the court's factual findings "if reasonable evidence and inferences support them" and we will affirm the court's legal conclusions "unless they are clearly erroneous." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79, ¶¶ 30–31 (2023). Legal conclusions are clearly erroneous only if, as a matter of law, "no one could reasonably find the evidence" supporting them meets the applicable burden of proof. *Id.* at 479, ¶ 31 (citation omitted).

**¶9** DCS has the burden of proving the allegations of a dependency petition by a preponderance of the evidence. A.R.S. § 8-844(C)(1). A "dependent child" is one who is "[i]n need of proper and effective parental care and control" but has no parent "willing to exercise or capable of exercising such care and control" or "whose home is unfit by reason of . . . neglect . . . by a parent." A.R.S. § 8-201(15)(a)(i), (iii). "Neglect" means a parent's "inability or unwillingness . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

**¶10** Father contends the dependency finding is based solely on the law enforcement raid and that DCS failed to prove there was any ongoing risk of harm, such as illegal drug use, at the time of the adjudication hearing. The juvenile court "must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child" is dependent. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48 ¶ 1 (App. 2016). But the circumstances that put the child's welfare at risk due to inadequate care or neglect by the parents "need not be continuous or actively occurring" at the time of the hearing to support a dependency finding. *Id.* at 51, ¶ 16. Instead, a "substantiated and unresolved" risk of harm to the child's health or welfare is sufficient. *See id.*

**¶11** At the time of the raid, the alleged criminal activity was serious enough to justify involvement of a S.W.A.T. team, and contrary to Father's denial, methamphetamine was found in the home. More importantly, Father's refusal to cooperate with DCS made it impossible to

evaluate whether the risks presented by those circumstances had abated. Father also continued living with Mother as of the time of the adjudication hearing, despite her positive test for fentanyl in February. The case manager opined that even if only one parent abuses substances, the child can still be at risk of harm because it may cause the other parent to "lose focus . . . and not do their duties as a parent towards that child." She also felt that Father was still not able to accurately identify safety threats to J.K.

¶12 Father also argues DCS failed to provide any "substantive services," demonstrating that DCS's "involvement in the family is not warranted under the law." The record shows otherwise. For example, Father refused to take the rule-out drug test and declined to participate in counseling or in parenting classes. He also refused to disclose where he was living until the adjudication hearing. As the juvenile court explained, Father's reluctance "to participate and cooperate hurts his case. I have no idea [about] the condition of the home. . . [or] whether [F]ather has improved his decision-making as to what an appropriate, safe and stable home for his child is." Thus, Father's own conduct obstructed DCS's ability to provide services that would help him mitigate the risk of harm to J.K. if he were returned to Father's care.

¶13 Finally, though the record supports Father's assertions that he appropriately parented J.K. during supervised visitation, and that J.K. is healthy and a good student, that evidence does not override reasonable evidence presented to the juvenile court showing that "Father is unwilling or unable to provide proper and effective parental care and control." *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004) (The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts."). Father has not shown the court's dependency order is clearly erroneous.

**CONCLUSION**

¶14 We affirm.



AMY M. WOOD • Clerk of the Court
FILED: TM